**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

SAMANTHA R. YOUNG,

      **Plaintiff,**

v.                                       **Case No. 3:13-cv-20719**

CAROLYN W. COLVIN,
**Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

## MEMORANDUM OPINION

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently before the Court on the parties' Motions for Judgment on the Pleadings. (ECF Nos. 10 and 12). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 7 and 11). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and affirms that decision.

## I.   Procedural History

On September 13, 2000, Lisa Young filed for SSI benefits on behalf of her then ten-year-old daughter, Plaintiff Samantha Young (hereinafter "Claimant"). (Tr. at 178). Claimant's mother alleged that Claimant was disabled since October 1, 1995. (*Id.*) In a

Childhood Disability Evaluation Form, Rosemary Smith, Psy.D., determined that Claimant suffered from attention deficit hyperactivity disorder ("ADHD"), depressive disorder not otherwise specified ("NOS"), and a learning disorder that when combined functionally equaled a listing and resulted in marked limitations in two domains. (*Id.* at 409-11). The Social Security Administration ("SSA") determined that Claimant was disabled as of September 1, 2000, with a primary diagnosis of ADHD and a secondary diagnosis of depressive disorder. (*Id.* at 52).

Claimant received SSI until the SSA completed a redetermination of her entitlement to benefits after she turned eighteen years old. (*Id.* at 54). During the redetermination process, Claimant alleged that she was disabled because of a seizure disorder, anxiety, depression, ADHD, and bipolar disorder. (*Id.* at 59). In August 2010, the SSA issued its decision as to redetermination. (*Id.* at 59). The SSA concluded that Claimant no longer qualified for SSI and that her disability had ceased that month. (*Id.*) Claimant's eligibility for benefits was terminated October 2010. (*Id.* at 54).

On August 23, 2010, Claimant requested reconsideration of the SSA's decision, and upon reconsideration in December 2010, a hearing officer determined that Claimant was not disabled. (*Id.* at 62, 88, 90). On January 8, 2011, Claimant filed a written request for an administrative hearing, which was held on March 24, 2011, and again on December 21, 2011, before the Honorable James P. Toschi, Administrative Law Judge ("ALJ"). (*Id.* at 21-51). By decision dated January 12, 2012, the ALJ determined that Claimant was not entitled to benefits. (*Id.* at 10-20).

The ALJ's decision became the final decision of the Commissioner on May 17, 2013, when the Appeals Council denied Claimant's request for review. (*Id.* at 1). On July 19, 2013, Claimant brought the present civil action seeking judicial review of the

administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed her Answer and a Transcript of the Proceedings on September 27, 2013. (ECF Nos. 8 and 9). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 10 and 12). Accordingly, this matter is ripe for resolution.

## II.   <u>Claimant's Background</u>

Claimant was twenty-one years old at the time of the December 21, 2011, administrative hearing. (Tr. at 234). She completed the ninth grade and is able to communicate in English. (*Id.* at 237-38). Claimant previously worked thirty hours per week as a cashier at a fast-food restaurant for a period of three months. (*Id.* at 25, 239).

## III.   <u>Summary of ALJ's Findings</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A). An individual that is eligible for SSI before attaining the age of eighteen must have his or her eligibility for benefits redetermined "by applying the criteria used in determining initial eligibility for individuals who are age 18 or older . . . either during the 1-year period beginning on the individual's 18th birthday or, in lieu of a continuing disability review, whenever the Commissioner determines that an individual's case is subject to a redetermination under this clause." 42 U.S.C. 1382c(a)(3)(H)(iii); *see also* 20 CFR § 416.987(a)-(c).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §

416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). This step does not apply to redeterminations at age eighteen. *Id.* § 416.987(b). The second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to establish, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences.[1] *Id.* § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific

---

[1] The inquiry also proceeds to the fifth step if the claimant has no past relevant work. 20 CFR § 416.920(g)(1).

job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. section 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 416.920a(e)(2).

In this case, the ALJ determined as a preliminary matter that Claimant attained age eighteen on July 4, 2008 and that she was eligible for SSI as a child for the month preceding her eighteenth birthday. (Tr. at 12, Finding No. 1). The ALJ also preliminarily found that after attaining age eighteen, Claimant was notified that she was no longer disabled as of August 1, 2010 based on a redetermination of Claimant's eligibility for benefits. (*Id.*) Because the first step of the sequential process is inapplicable to redeterminations, the ALJ began at the second inquiry and found that Claimant had the following severe impairments since August 1, 2010: "seizures; depressive disorder; bipolar disorder; and chronic obstructive pulmonary disease/asthma (20 C.F.R. 416.920(c))." (Tr. at 12-13, Finding No. 2). In making this finding, the ALJ determined that Claimant's allegations of iron deficiency and thyroid problems were "non-medically determinable impairments," and that Claimant's allegation of ADHD was not supported by any recent diagnosis. (*Id.* at 12-13). At the third step of the evaluation, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (*Id.* at 13-14, Finding No. 3). Accordingly, the ALJ determined that since August 1, 2010, Claimant possessed:

> [T]he residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations. The claimant would be limited to no driving or operating a motor vehicle. She should avoid ladders, ropes or scaffolds. She should avoid all exposure to extreme cold, extreme heat, pulmonary irritants, heights and moving

machinery. She would be limited to simple instructions and tasks. She would be limited to no fast-paced work or strict production quotas.

(Tr. at 14-18, Finding No. 4). At the fourth step, the ALJ found that Claimant had no past relevant work. (*Id.* at 18, Finding No. 5). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work-related experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (*Id.* at 18-20, Finding Nos. 6-9). The ALJ considered that (1) Claimant was born in 1990, and was defined as a younger individual; (2) she had a limited education and could communicate in English; and (3) transferability of job skills was not an issue because she did not have any relevant work. (*Id.* at 18-19, Finding Nos. 6-8). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy, (*id.* at 19-20, Finding No. 9), including work as a stock clerk at the medium level, shelving clerk at the light exertional level, and a document preparer at the sedentary exertional level. (*Id.* at 19). Therefore, the ALJ concluded that Claimant's disability ended on August 1, 2010, and that she had not become disabled again since that date. (*Id.* at 20, Finding No. 10).

## IV.   Claimant's Challenge to the Commissioner's Decision

Claimant raises a single challenge to the Commissioner's decision. She insists that the ALJ failed to adequately explain his assigning "no weight" to the opinion of Claimant's treating psychiatrist, Dr. Alexander Otellin. (ECF No. 10 at 4-7). Dr. Otellin opined that Claimant had marked limitations in carrying out simple instructions and interacting appropriately with the public. (Tr. at 663-64). He added that Claimant had extreme limitations in understanding and remembering complex instructions, carrying out complex instructions, making judgments on complex work-related decisions,

interacting appropriately with supervisors and co-workers, and responding appropriately to usual work situations and to changes in a routine work setting. (*Id.*) In support of her position, Claimant primarily cites a Fifth Circuit case, *Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000); the Social Security regulation that addresses the evaluation of opinion evidence, 20 C.F.R. section 416.927(c)[2]; and a social security ruling (SSR) on the subject of the weighing treating physician opinions, SSR 96-2p, 1996 WL 374188 (July 2, 1996). (ECF No. 10 at 6-7).

In response, the Commissioner contends that Claimant is asking the Court to impermissibly re-weigh the evidence and credit Dr. Otellin's opinion as to Claimant's disability, which is a decision within the province of the ALJ. (ECF No. 12 at 5). The Commissioner also asserts that a treating physician's opinion is not entitled to controlling weight if persuasive evidence contrary to the treating physician's opinion exists. (*Id.* at 6). The Commissioner avers that any reliance on *Newton* as persuasive authority is misplaced because that case only requires a detailed analysis of a treating physician's opinion after rejection by an ALJ where medical evidence from another treating or examining physician controverting the opinion is unavailable. (*Id.* at 8). In addition, the Commissioner explains that the ALJ is only required to articulate "good reasons" for assigning no weight to Dr. Otellin's opinion, and the ALJ did just that. (*Id.* at 7). Finally, the Commissioner insists that Claimant has failed to demonstrate that any error committed by the ALJ caused her harm, and that the record as a whole does not support Claimant's allegations of disability. (*Id.* at 10).[3]

---

[2] Claimant mistakenly cites 20 C.F.R. section 404.1527(d) as the controlling regulation in this case.

[3] Although Claimant does not make an argument in her brief that the ALJ should have recontacted Dr. Otellin, the Commissioner also asserts that the ALJ had no duty to recontact Dr. Otellin under the circumstances. (ECF No. 12 at 9).

## V.   __Relevant Medical History__

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issue in dispute.

### A. Treatment Records

At age six, Claimant was diagnosed with ADHD by Isabel Almase, M.D. (Tr. at 347). Between July 1996 and October 2000, Claimant frequently visited Shawnee Hills Outpatient Clinic and Shawnee Hills Medical Support Unit for treatment of her ADHD. (Tr. at 343-403). At times during that period, Claimant's parents described her as having problems with attention span, irritability, mood swings, and low self-esteem. (*Id.* at 343, 355, 368, 374, 375, 380, 382, 384, 392). Claimant was prescribed a variety of medications for these issues, including Adderall, Carbatrol, Desyrel, Dexedrine, Paxil, Ritalin, and Zoloft. (Tr. at 392, 395-98).

In June 2001, at age ten, Claimant visited Elizabeth Durham, a supervised psychologist, for completion of a mental profile. (Tr. at 405-08). Claimant complained of sleeping difficulties, crying episodes, high energy, and a dysphoric mood. (*Id.* at 405). After a review of Claimant's history and an examination of Claimant, Ms. Durham diagnosed Claimant with depressive disorder, NOS, based on Claimant's "depressed mood, diminished interest in activities, feelings of worthlessness, difficulty sleeping, crying episodes and history of 'wishing I was dead or never born.'" (*Id.* at 408). Ms. Durham also diagnosed Claimant with ADHD based on her "failure to give close attention to tasks, difficulty maintaining attention, being easily distracted, fidgeting and squirming in her seat, talking excessively and often interrupting [Ms. Durham]." (*Id.*) As her final diagnosis, Ms. Durham concluded that Claimant had a reading disorder based

on her reading ability "being substantially below that expected given her age, IQ and educational background." (*Id.*) Ms. Durham noted that Claimant's prognosis was fair and that Claimant possessed "intellectual functioning in the average range on the Full Scale IQ." (*Id.*) Ms. Durham also opined that Claimant's ability to communicate was adequate, her social functioning ability was mildly deficient, her interactions were appropriate, her ability to stay on task was mildly deficient, and her pace was within normal limits. (*Id.*)

Dr. Smith completed a childhood disability evaluation of Claimant later that June and relied on Ms. Durham's diagnoses. (*Id.* at 412). Dr. Smith determined that Claimant suffered from ADHD, depressive disorder NOS, and a learning disorder that when combined functionally equaled a listing and resulted in marked limitations in two domains. (*Id.* at 409-11).

On November 15, 2006, Claimant sought treatment from Samer Nasher, M.D., at Neurology & Pain Center, PLLC. (*Id.* at 456). Claimant complained of seizures and passing out. (*Id.*) Physical and neurological examinations revealed no abnormalities. (*Id.* at 457). An electroencephalogram (EEG) was ordered. (*Id.*) Dr. Nasher listed "CPS" and ADD as his assessments of Claimant's condition.[4] (*Id.*) On November 17, Dr. Nasher interpreted the EEG results and found them to be normal, but observed that this did not rule out a seizure disorder. (*Id.* at 595). Approximately one month later, Dr. Nasher also ordered a magnetic resonance imaging (MRI) of Claimant's brain with contrast. (*Id.* at 594). In analyzing the MRI, Dr. David Abramowitz noted "[q]uestionable minimal small vessel ischemic changes in the deep white matter at and above the level of the lateral ventricles," "[n]o enhancing lesion," and "[n]o other significant findings . . . in the

---

[4] Given the context of the visit, "CPS" likely represents an assessment of complex partial seizures.

brain." (*Id.*)

In January 2007, Claimant attended a follow-up appointment with Dr. Nasher. (*Id.* at 455). The record for the visit is mostly illegible, but it notes that Claimant still complains of seizures. (*Id.*) The record also lists migraine headaches, ADD, and "GTC/CPS" as assessments.[5] (*Id.*) It appears Naproxen was prescribed. (*Id.*) The next month, Claimant again visited Dr. Nasher. (*Id.* at 454). Dr. Nasher listed headaches, ADD, and "GTC/CPS" as assessments. (*Id.*) At her April 2007 visit with Dr. Nasher, Claimant again complained of headaches and described her mood as "bad." (*Id.* at 453). Again, the record for the visit is somewhat illegible, but it appears that Dr. Nasher prescribed LMG. (*Id.*) Claimant followed up with Dr. Nasher in August 2007 and again complained of headaches and seizures, including three seizures in a one-week span. (*Id.* at 452). Dr. Nasher again apparently prescribed LMG. (*Id.*)

In September 2007, Scott Spaulding, a licensed psychologist, completed a psychological evaluation of Claimant. (*Id.* at 415) Claimant reported "episodes of rage, anger, moodiness, racing thoughts, increased multi-tasking, helpless[ness], hopeless[ness], worthless[ness] and guilty feelings." (*Id.*) Other symptoms included defiance, refusal to accept blame, vindictiveness, argumentativeness, and crying spells. (*Id.* at 415-16). Mr. Spaulding noted in his evaluation that Claimant was diagnosed with seizure disorder in 2006 and "had three seizures within a six month time period." (*Id.* at 416). At the time of the evaluation, Claimant was taking Lamictal, Wellbutrin, Singular and Naproxen. (*Id.*) After examining Claimant and having Claimant perform a variety of tests, Mr. Spaulding diagnosed Claimant with mood disorder NOS, ADHD, oppositional defiance disorder, and learning disorder NOS. (*Id.* at 417-21). Mr. Spaulding

---

[5] Given the context of the visit, "GTC" likely represents generalized tonic-clonic seizures.

recommended that Claimant continue to take medication for her mood instability and that she attend psychotherapy. (*Id.* at 421).

Claimant returned to Dr. Nasher in September 2007 complaining of panic attacks and headaches. (*Id.* at 451). At her November 2007 appointment with Dr. Nasher, Claimant again complained of headaches along with a new complaint of "knots" under her right arm. (*Id.* at 450). Dr. Nasher listed headaches, ADD, "GTC/CPS," "SZ," and "possible bipolar" as his assessments. (*Id.*) Claimant next treated with Dr. Nasher in May 2009, and she complained of headaches at that appointment. (*Id.* at 448). Dr. Nasher's assessment lists headaches, ADD, "GTC/CPS," "SZ," "possible bipolar," and pregnancy. (*Id.*) Dr. Nasher recorded similar assessments at Claimant's June, August, October, and December 2009 visits. (*Id.* at 438, 445-47).

After giving birth in December 2009, Claimant was seen by Dr. El-Katib for a psychological consultation at Thomas Memorial Hospital. (*Id.* at 535). The subject of the consultation was whether Claimant would do any harm to herself or her child. (*Id.*) After examining Claimant, Dr. El-Katib diagnosed her with major depression, "recurrent chronic vs[.] bipolar depressed," and "grand mal seizures vs[.] pseudo seizure." (*Id.*) Dr. El-Katib recommended that Claimant follow-up with a therapist and continue to use Lamictal. (*Id.*)

Claimant was also seen by Kris Murthy, M.D., in December 2009 for a neurological consultation at Thomas Memorial Hospital. (*Id.* at 428-30). Claimant reported that she experienced five to six seizures in 2009 and that she stopped taking Lamictal during her pregnancy. (*Id.* at 428). After examining Claimant, Dr. Murthy's impression included "partial complex seizures with occasional secondary generalization, bipolar disorder, chronic obstructive pulmonary disease/asthma, tobacco use, and

postpartum." (*Id.* at 429). Dr. Murthy recommended that Claimant start taking Lamictal again. (*Id.*)

Claimant began treating with Dr. Otellin in October 2010. (*Id.* at 689). The record from that visit lists Claimant's chief complaint as "I am try [*sic*] to get disability. I freak out in big crowds. I couldn't keep jobs, it made me too nervous." (*Id.*) Dr. Otellin perceived that Claimant exhibited symptoms of social anxiety disorder, including "confusion, embarrassment, muscular tension, palpitations, and sweating" in certain situations. (*Id.*) Dr. Otellin recorded that Claimant was "friendly, fully communicative, and appear[ed] happy." (*Id.* at 690). Dr. Otellin also observed that Claimant's mood was "entirely normal with no signs of depression or mood elevation" and her affect was "appropriate, full range, and congruent with mood." (*Id.* at 691). Claimant's associations were "intact," her thinking was "logical," and her thought content was "appropriate." (*Id.*) Her cognitive functioning and fund of knowledge were "intact and age appropriate," and her short and long term memory were "intact." (*Id.*) Claimant possessed the ability to think in the abstract and perform arithmetic calculations. (*Id.*) Her social judgment was "intact" and she demonstrated no signs of anxiety, hyperactivity, or attention difficulty. (*Id.*) Dr. Otellin diagnosed Claimant with "bipolar 1, most recent episode mixed, mild," and recorded a Global Assessment of Functioning ("GAF") score of sixty.[6] (*Id.*) He prescribed Seroquel for Claimant. (*Id.*)

---

[6] The Global Assessment of Functioning ("GAF") Scale is a 100–point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Am. Psych. Assoc., 32 (4th ed. 2002) ("DSM–IV"). On the GAF scale, a higher score correlates with a less severe impairment. The GAF scale was abandoned as a measurement tool in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, (5th ed. 2013) ("DSM–5"), in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM–5 at 16. A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM–IV at 34.

Claimant next treated with Dr. Otellin in November 2010. (*Id.* at 687). She reported having episodes of "mood lability" and that she had seen no improvement since her October visit. (*Id.*) Dr. Otellin noted that Claimant was "glum, irritable, fully communicative, and tense." (*Id.*) He also observed that Claimant exhibited signs of anxiety and a short attention span. (*Id.*) His diagnosis of Claimant's condition remained unchanged, and Claimant's GAF score was again sixty. (*Id.* at 688). Dr. Otellin prescribed Zyprexa and Xanax. (*Id.*)

At an appointment one week later, Dr. Otellin reported that Claimant had a "partial response to treatment," including mood improvement and decreased symptoms of manic process and depression. (*Id.* at 685). Dr. Otellin observed that Claimant was friendly and less nervous than she was in the past, but still demonstrated signs of anxiety. (*Id.*) Claimant's mood was "entirely normal with no signs of depression or mood elevation." (*Id.*) Dr. Otellin noted that Claimant did not display signs of "hyperactive or attentional difficulties." (*Id.*) Again, Claimant's affect, social judgment, speech, language skills, short and long term memory, abstract thinking ability, cognitive functioning, and fund of knowledge did not cause Dr. Otellin any concern. (*Id.*) Dr. Otellin's diagnosis remained the same as did Claimant's GAF score. (*Id.* at 686) Claimant's Zyprexa dose was increased. (*Id.*)

Claimant's next visit with Dr. Otellin occurred approximately two weeks later. (*Id.* at 683). Dr. Otellin recorded that Claimant was "inadequately improved, thus far." (*Id.*) Claimant reported feeling symptoms of depression, irritability, and nervousness. (*Id.*) Dr. Otellin observed that Claimant was "friendly, attentive, fully communicative, well groomed, over weight [*sic*], but tense." (*Id.*) Her mood was "entirely normal with no signs of depression or mood elevation," and Claimant did not display signs of

- 14 -

"hyperactive or attentional difficulties." (*Id.* at 683-84). Dr. Otellin noted that Claimant displayed signs of anxiety. (*Id.* at 684). Again, Claimant's affect, social judgment, speech, language skills, short and long term memory, abstract thinking ability, cognitive functioning, and fund of knowledge did not cause Dr. Otellin any concern. (*Id.* at 683-84). Dr. Otellin's diagnosis and Claimant's GAF score remained unchanged. (*Id.* at 684). Dr. Otellin prescribed Lamictal and increased Claimant's Xanax dose. (*Id.*)

At her December 2010 appointment with Dr. Otellin, Claimant described new symptoms of narcolepsy and reported that she continued to experience symptoms of depression daily, although those symptoms had lessened in frequency and intensity. (*Id.* at 681). Claimant also stated that she continued to experience irritability and that "the intensity and frequency of anger or angry episodes have continued unchanged." (*Id.*) Dr. Otellin recorded that Claimant was "friendly, attentive, fully communicative, casually groomed, and relaxed." (*Id.*) Dr. Otellin observed that signs of "mild" depression were present and that Claimant's thought content was depressed. (*Id.*) Claimant did not display any signs of anxiety or "hyperactive or attentional difficulties." (*Id.*) Dr. Otellin's diagnosis and Claimant's GAF score were unchanged. (*Id.* at 682). He increased Claimant's Lamictal dose, recommended daily naps, and requested that a thyroid panel be performed. (*Id.*)

Claimant followed-up with Dr. Otellin in January 2011. (*Id.* at 679). Dr. Otellin noted that the thyroid test results were normal. (*Id.*) Claimant reported that symptoms of depression continued to occur daily, but with less frequency and intensity. (*Id.*) Claimant also disclosed that her irritability had improved, but her anger and angry episodes remained unchanged. (*Id.*) Dr. Otellin again observed signs of mild depression and depressed thought content. (*Id.*) Claimant did not display any signs of anxiety or

"hyperactive or attentional difficulties." (*Id.* at 680). Claimant's affect, social judgment, speech, language skills, short and long term memory, abstract thinking ability, cognitive functioning, and fund of knowledge did not cause Dr. Otellin any concern. (*Id.* at 679-80). Dr. Otellin's diagnosis and Claimant's GAF remained the same. (*Id.* at 680). Claimant's Lamictal dose was again increased. (*Id.*)

At her appointment with Dr. Otellin in February 2011, Claimant reported having a "few grand mal seizures" with the last one occurring the day before her visit. (*Id.* at 677). Other than that, Claimant's symptoms, Dr. Otellin's observations, and the diagnosis resembled that of Claimant's January 2011 visit. (*Id.* at 677-78). At her March 2011 visit, Claimant stated that she had not had any seizures and that her medication worked. (*Id.* at 675). She reported that she was not as irritable, but still experienced symptoms of depression. (*Id.*) Dr. Otellin's observations of Claimant and diagnosis mirrored that of Claimant's prior visit. (*Id.* at 675-76).

Claimant again treated with Dr. Otellin in April 2011, although the record for that visit is scant and only lists Claimant's unchanged diagnosis, GAF score, and medications. (*Id.* at 674). On the day of that appointment, Dr. Otellin completed a medical source statement form for Claimant's SSI claim. (*Id.* at 663-65). As stated above, Dr. Otellin opined that Claimant had marked limitations in carrying out simple instructions and interacting appropriately with the public. (*Id.* at 663-64). He added that Claimant had extreme limitations in understanding and remembering complex instructions, carrying out complex instructions, making judgments on complex work-related decisions, interacting appropriately with supervisors and co-workers, and responding appropriately to usual work situations and to changes in a routine work setting. (*Id.*) In support of his assessment, Dr. Otellin listed Claimant's "irritability,

panic [illegible], anger, inability to tolerate stress and fast pace." (*Id.* at 664).

At her May 2011 visit, Claimant reported that she had lost weight by exercising using the Microsoft Xbox 360, and she denied symptoms of mania and depression. (*Id.* at 672). Dr. Otellin recorded that Claimant was "slightly improved, thus far." (*Id.*) He observed that Claimant's mental status showed "no gross abnormalities," her mood was "euthymic with no signs of depression or manic process," and she showed no signs of anxiety. (*Id.*) Claimant's speech, language skills, association, thought content, cognitive functioning, fund of knowledge, insight, and judgment did not cause Dr. Otellin any concern. (*Id.*) Dr. Otellin's diagnosis and Claimant's GAF remained unchanged, and her existing treatment was continued. (*Id.* at 672-73). The progress notes for Claimant's July and September 2011 appointments with Dr. Otellin are identical in all relevant respects. (*Id.* at 668-71). At her September appointment, Claimant stated that her parents and her boyfriend were fighting, but she dealt with the stress "well." (*Id.* at 668). At that appointment, Dr. Otellin increased Claimant's Xanax dose. (*Id.*)

In November 2011, Claimant treated with Dr. Otellin for the final time. (*Id.* at 666-67). Claimant asserted that she had a seizure and that she had stopped taking Lamictal. (*Id.* at 666). She also stated that she was no longer taking Seasonique and had not taken it for nine months "or less." (*Id.*) Dr. Otellin wrote in his report that Claimant had told him that she was taking Seasonique two months prior to that appointment. (*Id.*) Claimant did not describe any symptoms of depression, and Dr. Otellin recorded that her mood was "entirely normal with no signs of depression or mood elevation." (*Id.*) Claimant's speech, language skills, association, thought content, cognitive functioning, fund of knowledge, insight, and judgment did not cause Dr. Otellin any concern. (*Id.*) A urine drug screen performed that day revealed that Claimant tested

positive for cannabis, but negative for benzodiazepine. (*Id.*) Dr. Otellin observed that Claimant "got upset" when she was informed of the drug screen results. (*Id.* at 667). Claimant also stated that she was "less anxious" and no longer taking Xanax, except "maybe one [that] morning." (*Id.*) Dr. Otellin discontinued Xanax and dismissed Claimant as his patient. (*Id.*)

### B. Evaluations and Opinions

#### 1. Mental Evaluations and Opinions

On June 11, 2010, Ms. Durham, now a licensed psychologist, completed a mental evaluation of Claimant that included a mental status examination and a clinical interview. (Tr. at 458-62). Ms. Durham noted that Claimant had a good attitude and was cooperative. (*Id.* at 458). Claimant reported that she received benefits in the past because she has bipolar disorder, epilepsy, ADHD, and "part schizophrenic," but schizophrenia was not "put . . . down on [her] paper." (*Id.* at 459). Claimant stated that her symptoms included poor sleeping patterns, crying episodes, and a dysphoric mood during the two weeks preceding the evaluation. (*Id.*) Claimant informed Ms. Durham that she stopped attending school in the tenth grade because her "seizures were getting so bad." (*Id.*) In her evaluation of Claimant, Ms. Durham reviewed the psychological evaluation that she completed in June 2001 and noted that Claimant had a verbal IQ of ninety-five, performance IQ of ninety-four, and full scale IQ of ninety-four on the Wechsler Intelligence Scale for Children, Third Edition. (*Id.*) In 2001, Ms. Durham had diagnosed Claimant with depressive disorder NOS, ADHD, and a reading disorder. (*Id.*)

During the 2010 evaluation, Ms. Durham inquired as to Claimant's vocational background, and Claimant stated that she worked at McDonald's for three months, but quit because "it was too rough getting up at 5 o'clock in the morning to go to work." (*Id.*

at 460). Claimant stated that her daily activities consisted of playing with her child, helping her mom clean the house, and occasionally helping her dad "cook and stuff." (*Id.* at 461). She also conveyed that she talked with her friends daily and saw friends at least three times per week. (*Id.*)

Ms. Durham performed a mental status examination of Claimant and found that she interacted appropriately, the length and depth of her verbal responses were adequate, she spontaneously generated conversation, and her speech was relevant and coherent. (*Id.* at 460). Claimant's mood was dysphoric; her affect was restricted; and her thought process, content, and perception presented no issues. (*Id.*) Ms. Durham recorded that Claimant's insight was fair and her judgment was within normal limits. (*Id.*) Claimant's immediate, recent, and remote memory were all within normal limits when tested. (*Id.*) Ms. Durham noted that Claimant's concentration was within normal limits after performing a digit span test and that her psychomotor behavior was within normal limits based on observation. (*Id.*)

Ms. Durham diagnosed Claimant with depressive disorder NOS and seizure disorder as reported by Claimant. (*Id.*) Ms. Durham found support for her diagnosis of depressive disorder based on Claimant's report of "depressed mood, diminished interest in activities, feelings of worthlessness, difficulty sleeping and crying episodes." (*Id.* at 461). Ms. Durham recorded that Claimant's prognosis was fair. (*Id.*) Ms. Durham described Claimant's social functioning, persistence, and pace as within normal limits based on information provided by Claimant and Ms. Durham's observations of Claimant. (*Id.*) Ms. Durham also opined that Claimant was capable of managing her own finances. (*Id.*)

On August 6, 2010, Jeff Harlow, Ph.D., provided a psychiatric review technique based on Ms. Durham's two evaluations and forms completed by Claimant regarding her disability. (*Id.* at 471-84). Dr. Harlow indicated that Claimant suffered from depressive disorder NOS, but concluded that Claimant did not meet any of the mental impairment Listings as she had no restriction on activities of daily living; no difficulties in maintaining social functioning or maintaining concentration, persistence, or pace; and no episodes of decompensation of an extended duration. (*Id.* at 481). Dr. Harlow concluded Claimant's mental impairment was not severe because her key functional capacities were within normal limits at her mental evaluation. (*Id.* at 483). Dr. Harlow assigned full weight of evidence to Ms. Durham's evaluation and found that any "comments about functional capacities" contrary to the results of the evaluation were only partially credible. (*Id.*)

On October 1, 2010, Holly Cloonan, Ph.D., completed a case analysis. (*Id.* at 521). Dr. Cloonan noted that Claimant did not allege any new limits in functional capacity associated with her mental condition on reconsideration. (*Id.*) Dr. Cloonan reviewed the medical evidence in the file and affirmed Dr. Harlow's psychiatric review technique as written. (*Id.*)

### 2. Physical Evaluations and Opinions

On August 2, 2010, A. Rafael Gomez, M.D., provided a Physical RFC assessment regarding Claimant's functional limitations. (*Id.* at 463-70). Dr. Gomez listed Claimant's primary diagnosis as seizure disorder and secondary diagnosis as migraine headaches. (*Id.* at 463). Dr. Gomez found Claimant to be credible and active, and he noted that there was no medical source statement regarding Claimant's physical capacities in the file. (*Id.* at 468-69). He opined that Claimant had no exertional limitations, but gave her

"seizure precautions." (*Id.* at 468) Those precautions include refraining from ever climbing ladders, ropes, or scaffolds, and avoiding all exposure to vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. (*Id.* at 465, 467). Otherwise, Claimant had no exertional, postural, manipulative, visual, communicative, or environmental limitations. (*Id.* at 464-67).

On October 4, 2010, consultative physician James Egnor, M.D., provided a case analysis in which he reviewed all of the evidence in the file and affirmed as written Dr. Gomez's August 2, 2010 opinion. (*Id.* at 522).

## VI.   <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. Thus, the decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then

the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    Discussion

### The ALJ's Consideration of the Treating Source's Opinion

Claimant contends that the ALJ violated Social Security regulations and rulings by failing to justify his conclusion that Dr. Otellin's opinion was entitled to no weight. (ECF No. 10 at 4). She insists that the ALJ improperly disregarded Dr. Otellin's opinion that Claimant has marked and extreme limitations in "several vocationally significant areas." (*Id.* at 5). Claimant also asserts that Dr. Otellin's opinion is entitled to some weight rather than none. (*Id.* at 7).

20 C.F.R. section 416.927(c) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits.[7] In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *See* 20 C.F.R. § 416.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with

---

[7] Medical source opinions on issues reserved to the Commissioner are treated differently than other medical source opinions; they are never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." SSR 96-5p, 1996 WL 374183, at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3. Medical opinions include statements as to "symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). However, an opinion as to a claimant's RFC, while it may come from a medical source, is not a medical opinion. SSR 96-5p, 1996 WL 374183, at *2.

other substantial evidence. *Id.* If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. section 416.927(c)(2)-(6),[8] and must explain the reasons for the weight given to the opinions. "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

As Claimant points out, the ALJ did not supply details in his written decision regarding how he applied the factors in 20 C.F.R. section 416.927(c) to determine the weight given to Dr. Otellin's opinion. Instead, the ALJ summarized approximately half of the records from Claimant's treatment with Dr. Otellin along with Dr. Otellin's opinion in the medical source statement form and concluded that Dr. Otellin's opinion was entitled to no weight "based on the above evaluation and medical expert testimony." (Tr. at 16, 18). At the December 21, 2011 hearing, Claimant's attorney posed a

_____

[8] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

hypothetical question to the vocational expert based on Dr. Otellin's opinion in the medical source statement form. (*Id.* at 50). The ALJ found that the facts contained in the hypothetical were not supported by "medical evidence," and thus, rejected the hypothetical in his decision. (*Id.* at 20). Claimant insists that a more substantial analysis of Dr. Otellin's opinion was required under 20 C.F.R. section 416.927(c) and SSR 96-2p. (ECF No. 10 at 6-7).

However, the Court does not find the absence of specifics regarding each factor to constitute error requiring a remand of the Commissioner's decision. Although 20 C.F.R. section 416.927(c) provides that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulation does not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulation mandates only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. Social Security Ruling 96-2p provides additional clarification of the ALJ's responsibility to give good reasons, stating:

> When the determination or decision: is not fully favorable, e.g., is a denial . . . the notice of determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Cases discussing this duty take different approaches on what and how much the ALJ must include in the written opinion to constitute an adequate explanation. Some courts require the ALJ to "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Newbury v. Astrue,* 321 Fed. App'x 16, 17 (2nd Cir. 2000) (quoting *Halloran v. Barnhart,* 362 F.3d 28, 33 (2nd Cir. 2004)); *see also Sharfarz v.*

*Bowen,* 825 F.2d 278, 279 (11th Cir. 1987). Other courts only insist on a detailed analysis of the weight given to a treating physician's opinion under the factors when there is an absence of "reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist." *Rollins v. Astrue,* 464 Fed. App'x. 353, 358 (5th Cir. 2012) (*per curiam*) (quoting *Newton*, 209 F.3d at 453). Finally, some courts take the position that while the ALJ must consider the factors, he is not required to discuss each one in his opinion as long as a subsequent reviewer is able to understand the weight given to the opinions and the reasons for that weight. *Oldham v. Astrue,* 509 F.3d 1254, 1258 (10th Cir. 2007); *see also Green v. Astrue,* 588 F. Supp. 2d 147, 155 (D. Mass. 2008). Simply stated, the adequacy of the written discussion is measured by its clarity to subsequent reviewers. The Court finds this view most harmonious with the language and intent of the regulations and rulings.

The ALJ began his RFC discussion by recognizing that certain rules and regulations control the weighing of medical opinion evidence, including 20 C.F.R. section 416.927 and "SSRs 96-2p, 96-5p, 96-6p and 06-3p." (Tr. at 15). Next, the ALJ summarized Claimant's treatment records and the medical opinion evidence in the record. (*Id.* at 15-18). The ALJ specifically discussed records from Dr. Otellin's treatment of Claimant, beginning with her first examination and ending with her last appointment. (*Id.* at 16). The ALJ pointed out that at Claimant's first visit with Dr. Otellin, her mood was normal with no signs of depression and her affect, association, thought content, cognitive functioning, fund of knowledge, short and long-term memory, and social judgment caused Dr. Otellin no concern. (*Id.*) The ALJ also noted that Claimant's irritability and depression continually improved during her treatment with Dr. Otellin. (*Id.*)

Before addressing Dr. Otellin's opinion contained in the medical source statement form, the ALJ also reviewed the psychological consultative examination performed by Ms. Durham, Dr. Harlow's psychiatric review technique, Dr. Cloonan's case analysis, and medical expert opinions provided at both hearings. (*Id.* at 16-18). Dr. Harlow's and Dr. Cloonan's opinions were given significant weight "as they [were] consistent with the medical evidence of record." (*Id.* at 18).

Joseph Carver, Ph.D., testified at Claimant's March 24, 2011 hearing that the evaluation performed by Ms. Durham showed that Claimant suffered from depressive disorder NOS, but she had no psychological impairment in social function given that she could perform chores, care for her daughter, and interact with friends. (*Id.* at 25). Dr. Carver also opined that there were no "significant psychological limitations" based on Claimant's IQ scores placing her in the "average range." (*Id.*) The ALJ assigned significant weight to Dr. Carver's opinion because it was "consistent with the medical evidence of record as a whole." (*Id.* at 17). At the December 21, 2011 hearing, Richard Cohen, M.D., testified that Claimant was diagnosed with depression NOS, but that her mood swings caused that diagnosis to change to mild bipolar disorder. (*Id.* at 41). Dr. Cohen recognized that Claimant had a history of ADHD, but that her recent digit span test results were better than average. (*Id.*) Dr. Cohen opined that Claimant's psychological impairment did not meet a listing because her activities of daily living were only mildly impaired; her social functioning was, at worst, moderately impaired; she had mild to moderate impairment of concentration, persistence, and pace; and there were no episodes of deterioration for extended periods of time. (*Id.* at 42). Dr. Cohen went on to assert that Claimant could "at least" perform "simple, repetitive tasks in a low stress setting," and that Claimant would only be mildly impaired in dealing with the

public, co-workers, and supervisors. (*Id.* at 42-43). After further questioning by the ALJ, Dr. Cohen opined that Claimant could partake in moderately paced, but not fast-paced work. (*Id.* at 43). The ALJ assigned significant weight to Dr. Cohen's opinions as well because they were "consistent with the medical evidence of record." (*Id.* at 18).

After discussing all of the other medical opinion evidence present in the record, the ALJ finally turned to Dr. Otellin's opinion that Claimant possessed marked limitations in carrying out simple instructions and interacting appropriately with the public, and that Claimant had extreme limitations in understanding and remembering complex instructions, carrying out complex instructions, making judgments on complex work-related decisions, interacting appropriately with supervisors and co-workers, and responding appropriately to usual work situations and to changes in a routine work setting. (*Id.*) It is sufficiently clear that when the ALJ found Dr. Otellin's opinion to be without support from the other evidence of record (*id.* at 18, 20), the ALJ was referring to the medical opinion evidence he had just reviewed in detail. In addition, the Court can infer from the explanation provided by the ALJ that he used the appropriate factors in weighing Dr. Otellin's opinion. The ALJ recognized that Dr. Otellin was Claimant's treating physician and that Dr. Otellin was a psychiatrist. (*Id.* at 18). The ALJ also examined the consistency and supportability of the various opinions as demonstrated by his thorough review of Claimant's treatment records and the medical opinion evidence. (*Id.* at 16-18). Applying the sufficient clarity standard enunciated above, the Court finds that the ALJ adequately explained his reasons for assigning no weight to Dr. Otellin's opinion.

The Court also finds that the ALJ's assignment of no weight to Dr. Otellin's opinion is supported by substantial evidence. At the third step of the inquiry, the ALJ

recognized that Claimant took care of her child, adequately performed self-care, prepared simple foods, shopped, and helped her mother clean the house. (*Id.* at 14). The ALJ also noted that Claimant reported she talked on the phone, saw friends at least three times a week, and attended doctor appointments. (*Id.*) In addition, the ALJ observed that Claimant watched television and performed within normal limits on a digit span test. (*Id.*) During the RFC portion of the inquiry, the ALJ addressed treatment records that evidenced Claimant was less irritable and less depressed after treating with Dr. Otellin. (*Id.* at 16). The same records also showed that mental status examinations of Claimant by Dr. Otellin were frequently within normal limits other than occasional depressed thought content or signs of mild depression. (*Id.* at 666, 668, 670, 672, 675, 677, 679-80, 681, 683-84, 685, 690-91). In reviewing Dr. Otellin's records, the ALJ specifically noted that Dr. Otellin assigned a GAF score of sixty to Claimant at her first visit, (*id.* at 13), indicating *only* "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM–IV at 34. Dr. Otellin assigned the same GAF score at every subsequent appointment. Not only do Dr. Otellin's treatment records and diagnoses of Claimant undermine the opinion he provided in the medical source statement form,[9] opinions from other experts were also contrary to Dr. Otellin's opinion.

---

[9] Dr. Otellin did not elaborate much on why he checked certain boxes on the medical source statement form, but he did write that the factors supporting his assessment were Claimant's "irritability, panic reactions, anger, inability to tolerate stress and fast pace." (Tr. at 663-64). The factual foundation for these factors is not readily apparent, nor is it apparent that they rise to the level of severity assigned by Dr. Otellin via box checking. However, it should be noted that the medical source statement was prepared in April 2011, and Dr. Otellin's treatment notes continue through November 2011. Considering his treatment record as a whole, as the ALJ did, the medical source statement is simply inconsistent with the treatment notes. For instance, Dr. Otellin's narrative notes describing Claimant's mental status at her various appointments in 2011 depict her as "friendly," "attentive," with a mood "entirely normal," even "happy," and with no signs of attention deficit, memory loss, or anxiety. (Tr. at 666, 668, 670, 672, 675, 677, 679-80, 683, 685).

The ALJ reviewed Ms. Durham's psychological evaluation of Claimant in which Ms. Durham concluded that Claimant's social functioning, persistence, pace, concentration, memory, and psychomotor behavior were all within normal limits. (Tr. at 458-462). The ALJ also reviewed the opinions of Drs. Carver, Cloonan, Cohen, and Harlow, who all conveyed, to some degree, that Dr. Otellin's opinion as to Claimant's limitations was not supported by medical evidence. (*Id.* at 17-18). The Court agrees with the ALJ's implicit conclusion that this evidence is persuasive. *See Coffman*, 829 at 517 (recognizing a treating physician's opinion may be rejected where persuasive contrary evidence is in the record). Given Claimant's treatment records and the medical opinion evidence, the Court finds that the ALJ's assignment of no weight to Dr. Otellin's opinion is supported by substantial evidence.

Finally, Claimant's reliance on the purportedly persuasive *Newton* case is unavailing. In that case, the Fifth Circuit declared that "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Newton*, 209 F.3d at 453 (emphasis in original). Here, Ms. Durham's mental evaluation of Claimant controverted Dr. Otellin's opinion and Ms. Durham's evaluation constituted reliable medical evidence. As such, the ALJ would not have been required to perform a detailed analysis of Dr. Otellin's views under 20 C.F.R. section 416.927(c)(2). Moreover, the Court previously addressed *Newton* in its discussion of the appropriate standard to apply to similar challenges and found that the sufficient clarity approach best represents the language and intent of the regulations and rulings. The ALJ's discussion of Dr. Otellin's opinion satisfies this approach. Thus,

Claimant's challenge to the Commissioner's decision is without merit.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to the Plaintiff and counsel of record.

**ENTERED**: September 12, 2014

Cheryl A. Eifert
United States Magistrate Judge